You'll argue in the last case on the oral argument calendar, S.E.C. v. Medley . You're last on the calendar. You get treated to all of the panoply of other cases we see. And we've all been in your shoes, so we appreciate your patience. Counsel, please, the court. My name is Irving Einhorn. I'm counsel for appellant Stanley Medley. And it's an honor for me to be here at this stage in my career. This is my first appellate argument. You're welcome. I hope it goes well. At any rate, I'm here because my client, Mr. Medley, relied on S.E.C. Rule 144K when selling shares that he acquired from others. And Rule 144 is a safe harbor that the S.E.C. passed in 1972 to give some clarity to the confusion that existed over when somebody was a participant in distribution. And it was supposed to give guidance on how to interpret the Section 4.1 exemption under the Securities Act of 1933. And the rule gets passed, and you comply with this rule. You're deemed not to be an underwriter, not to be engaged in a distribution of securities. Can I jump in with a question right away? Even assuming that we interpret 144K the way you do, how does the Golden Chain virtual lender transaction comply with 144K's safe harbor? Clearly, the transaction all happened on the same day, and so there wasn't this. So it appeared that Medley was acquiring the securities directly from an affiliate. Well, my understanding, and I could be wrong, is that it was structured that the closing would take place first, and then immediately upon the closing, the transaction, the acquisition, would take place with people who had resigned their positions and were no longer affiliates. If I'm wrong about that, I'm going to be off base on that transaction. I didn't see any second agreement in that transaction. Just the one agreement that closed on February 11, 1999. Well, my understanding was that all of these transactions were the acquisition of the securities by the group. Medley happened to be one of them. All took place subsequent, maybe minutes later, but subsequent to the closing of the merger. Does it make a difference for your argument if it's a unitary transaction or a two-step transaction? Yes, it does. So you could see that a purely unitary transaction would not afford the protection? I think so. I think the people that he acquired them from would still be considered affiliates at the time. Well, I'm going to address that. But my client availed himself of 144K. The lower court did not address Rule 144K. The lower court looked at Section 4.1 and did some kind of a purchaser-seller analysis, drew from other cases, other statutes, and concluded that there was a distribution taking place. My client, I believe, complied with the letter of Rule 144K and with the subsequent no-action letters and staff interpretations defining or elaborating on the scope of Rule 144K. Before you get into that, I think the broader question, and leaving aside the district court's analysis for the moment, if we start with the assumption that a unitary transaction does not afford a safe harbor, why shouldn't we be able to look past the form of the transaction, even if it's a two-step transaction, and to say, in essence, this really was a unitary transaction because that's the way it was structured? My answer to that is that you have a clearly written rule that's interpreted one way. It's entitled to deference by the courts. If you don't like the result you get with the rule, you think it's the wrong result, then change the rule. Issue an interpretation. But every time an SEC no-action letter comes out and an interpretation comes out, it is widely read and distributed, and people structure transactions just like they structure real estate transactions. The trustee doesn't get recorded until the money comes, and there's timing to these things. People rely on that. You may get a result here by applying the law and the interpretations this way that you don't like, but I don't think the answer is to disregard the rule because you don't like the result. I think the answer is, and the SEC has done this in other situations, change the rule. Issue another interpretation. Do something. Get the message out that in this type of transaction, this isn't what you do. You may have a case here where it's very close in time to the merger closing and the stock being transferred. What happens if it's a day later, two days later, a month later? The rule is the rule is the rule is the rule. How about the fact that some of these agreements or two of the agreements indicate in the first agreement that it's contingent on the second agreement closing and that if the second agreement doesn't close, that will unwind the first agreement or there's an option to unwind. That seems to bring those two agreements very close to a unitary transaction. It does. I grant you that, but you are allowed to structure transactions. When you close on a piece of real estate or you buy an automobile, you don't get the pink slip until they have your money. So you are allowed to structure transactions and complex business transactions. A lot of due diligence, a lot of paperwork has to come in. If we don't get this, then this doesn't happen. That's what happens in these securities transactions and merger transactions. Not just this kind of merger transaction, but when one bank buys another bank, it is a structured transaction. Things take place at certain times and certain dates, and that's the practice. That's the way things are done. So is this like an internal revenue case, sort of the difference between avoidance and evasion? That is a good one. Well, I don't know if I can frame it in those terms. I know that my client reads these rules and reads these interpretations, and he's been told by others that you can do it. Is it a loophole? Why can somebody who is an affiliate sell his stock 91 days after he ceases to be an affiliate, but somebody who bought the stock the day before the affiliate ceases being an affiliate may have to wait two years? There's an anomaly there, but that is the rule. And you can't just say, well, he can sell his stock 91 days from now. I bought it from him 91 days ago. I can go out and sell my stock. You can't do that. That's not what the rule permits you to do. And the rule permits you to do certain things. That's what Mr. Medley did. You don't like the result. I know the lower court didn't like the result. The lower court also had a history with this case. People went to jail. Everybody got convicted. There was a massive market manipulation. We don't have any history, so you've got a blank slate up here. We know what this history was. Bottom line is it may not like the result, but the rule is the rule. And people followed it, not just in this case, in many, many cases. To get back to Judge Akuta's question, which is something I think is important, are you saying that basically it doesn't make any difference whether the transactions are truly independent or whether they are contingent upon each other? The practical answer is that the second transaction won't take place if the first one doesn't take place, or the first one won't take place unless the second one will take place. They are interrelated. And is that an answer to the question? They are, though, structured to take place one after the other when people have different statuses. And you can say, oh, these are arbitrary distinctions. But, yes, they are. But they are distinctions. Now, the SEC has an integration doctrine that I guess it uses in a different context. Why shouldn't that doctrine be applicable to this pair of transactions? Because the rule talks about date of acquisition. The rule sets forth the criteria. This rule does not talk about integration. Integration, which Judge Cote used, well, the integration doctrine is to determine when offerings are close together and you rely on a private placement here and another exemption here, are they all part of one and the same offering? And so Judge Cote took that and tried to apply it to what happened in a reverse merger situation, called it an application of the integration doctrine. But I think the real answer is that this rule doesn't talk about integration. This rule talks about on the date of acquisition. That's when we determine who you are, who you acquired your shares from, and that's when the clock starts running, the date of acquisition. Not the date you agree to enter into the contract. Not the date you perform the services which would make you entitled to receive the shares. The date you got it in your hand. The date when you got the risk of loss was transferred to you. That's the date. That's what the rule talks about. And it doesn't integrate that with other dates and other times. Well, at any rate, my client actually acquired these shares on a date when the people he acquired it from at a moment, perhaps, when the people he acquired it from were non-affiliates who had held the stock for two years and he was a non-affiliate when he acquired the shares and he complied with Rule 144K. I wanted to talk to just address the issue of relief very briefly. The court made a couple of findings which I have a great deal of difficulty with. It's my understanding that on summary judgment the facts presented by the person, the non-moving party, are to be deemed true. And the court found that, unless there's substantial evidence to refute that or rebut that conclusion, but the court found that Mr. Medley could not reasonably have relied in assessing the degree of scienter, which is the critical issue in determining what relief is appropriate, that he could not have reasonably relied on the attorney's opinions he looked at. And that, I think, is appropriate if we had ever asserted reliance on the advice of counsel as a defense. We have never done that. What we have said is Mr. Medley, reading the rule itself, having seen transactions like this during his career, sees these letters, which are consistent with what he's doing, wouldn't it give him some comfort that what he was doing was within the bounds of Rule 144K? The district court also relied on this cover-up issue with, I think, Robert Bryan. Yeah. All right. Yeah. I'd like to address that. Cover-up from who? A couple years after the fact, he's asked some questions. Why did you put the stock into this account as opposed to that account? What's the difference? These are not British Virgin Islands or Panamanian corporations. You just walk into Morgan Stanley and you say, who controls Byzantine Management's account? There was no difficulty finding out that it was Mr. Medley that controlled these accounts. We often do business. I'm a professional corporation. People do business under corporate names. You're probably not a professional corporation under somebody else's name. No, but consulting firms are professional corporations. The thing that struck me as odd, though, is that the record shows that Medley has virtually no contact with Bryan, doesn't even know where he lives, hasn't seen him in years. That's an awful lot of trust to give a huge amount of stock, which apparently had a fairly substantial amount of value to what appears to me to be just a nominee. Well, my understanding was that he talks and works with Bryan on a regular basis. He didn't know where the man moved. The man moved recently, didn't know where he moved. He's the godfather to his children, and he has control over assets. In case anything happens to Stan Medley, Mr. Bryan will be able to take care of Medley's children until such time as the estate is probated or whatever. So we don't know whether Medley was declaring this as income that he earned and paid taxes on and all that sort of thing. Medley has stated that he has declared the income and paid the taxes on everything, and that all the corporations that he uses, the vehicles he uses, are all current, pay their taxes. I was thinking Bryan. Because, I mean, there would be an issue there if the stock is transferred and placed in the name of Bryan as to whether or not he's now the owner of the stock, in which case he's just received a very valuable gift that the Internal Revenue Service would sure like to know about. Well, it's my understanding that that stock goes to Medley through Bryan. He's the real owner, even though it's held by his dear friend, Mr. Bryan. You're just saying he's a nominee. That's your argument. He is a nominee. But, you know, you want to hide something. My practice is representing people with SEC subpoenas in their hand. You can have offshore corporations. You can go to great lengths and stymie the SEC for years, as have some of my other clients, by forming offshore corporations and having them trade through Scott Trade and E-Trade and banks in Switzerland and Liechtenstein and Panama. So that wasn't done here. You're going to structure the transaction differently if you're trying to hide it. Is that what you're saying? Well, fortunately, they only come to me with the subpoena in their hand, not when they're going to do the business. A much safer practice. But I have learned from experience that if you want to hide and frustrate the government, you don't do it by opening up an account at Morgan Stanley, putting on there who the U.S. domicile persons are controlling the account, and having it, the SEC, be able to walk in there and see what's happening. Getting back to the district court summary judgment, because that's what we're talking about, you're saying that the district court should have discounted this evidence of Brockham, the nominee, and other accounts that were open in considering the Sienter issue? Yes. It should have accepted Medley's representations as to why he was doing this and understood that he is fallible, that you ask in a deposition years later, why did you get this stock and put it into that account? Because it's not the only transactions the man's doing that he might not have been able to come up with the best response ever as to why on Tuesday, you know, in 1998, he moved the stock into this account. I think his explanation should have been credited. There is no real evidence, I mean, other than it isn't in his name that he uses a corporate vehicle, there's no evidence that he's concealing anything. The SEC doesn't even need a subpoena to walk into a brokerage firm and get those records. It just sends a letter or sends somebody in there, can get the records. It doesn't show up as a Panamanian corporation. I just think that it's reached a little too far to get the result that the court wanted. Do you want to save some time for rebuttal? I would like to save some time. Thank you, counsel. Thank you very much. May it please the court, I'm Tracy Harden on behalf of the Securities and Exchange Commission. I think the court and appellant have all properly focused on what is the key question to liability here, which is whether Mr. Medley did take these shares from affiliates of the shell companies involved in these mergers. And it is the commission's view, as properly, I think, recognized by the court in its questions, that when the transactions are this closely related, given the context of the registration requirements in Section 5, it's important to look beyond the structure of the or beyond the form of the transactions to their actual substance. Let me ask you about the form for a moment. Do you agree that, at least technically, all three of these transactions complied with 144K? No, Your Honor. It's our position that none of these transactions technically complied with 144K. Certainly. First of all, you're correct that the virtual lender transaction was all embodied in a single agreement. There was not this form of a separate reorganization agreement and then a second stock purchase agreement. And it's the commission's position, and we think it's supported by the district court analysis and the Second Circuit analysis dealt with in our briefs, that when you're viewing the question of affiliate status, you have to look at the substance of the entire transaction through which the shares are transferred. And if the affiliates... But that's not in the rule, right? I mean, I'm just asking about the plain language of the rule. Well, Your Honor, actually, you know, the appellant has put forth the proposition that Rule 144 specifically says that you look to the date of acquisition for the date of affiliate status. That's not, in fact, what the rule says, nor is that what any of the interpretations that appellant points to say. All of those authorities are dealing with the measuring of the holding period under Rule 144. That's a separate question from assessing the question of when somebody ceases to be an affiliate. And, in fact, the commission's staff, not the commission itself, but has issued public interpretations in the past viewing the two differently. And there's a good reason for that. If you look at the purposes behind each of these questions, to back up, Section 401 is meant to provide an exemption from registration for ordinary trading transactions through individual members of the public. Right, right. But it's also meant to retain the registration requirement for direct distributions from issuers to the public, but also for indirect distributions from issuers or their affiliates through an intermediary or an underwriter, as a statutory term, to the public. So how long under these facts do you think, had the former directors and officers and shareholders retained their shares and not sold them, how long do you think they would be considered affiliates under your definition? Well, there are two separate questions there. If we're talking about the affiliates themselves selling to the public, the rule provides for a three-month window. But when we're talking about the intermediary here, MEDLI, the Second Circuit and I think at bottom what the district court was getting to, look to whether this is part of the same transaction. And so timing is one factor in that, but you also have to look at whether the transfer of shares is part and parcel of the same transaction. I understand your argument. I think Chief Jakutu was starting from a different spot, which is if you apply the letter of the rule, I think Mr. MEDLI has a point. You don't seem ready to concede that. And I'm leaving aside the integration theory, which I think we'll get to in a minute. But why don't you think under the letter of the rule that he has a point? Because I don't think the letter of the rule answers the question of when someone ceases to be an affiliate. The letter of the rule and the interpretations that appellant point to deal with the holding period. The point of the holding period is to ensure that this is not, in fact, an indirect distribution. So you want to assure that individuals who are taking from affiliates are taking for investment purposes. They're assuming the economic risk of an investment, and they're not just a conduit for sale to the public. But getting back to my question, when does somebody cease to be an affiliate under your theory then? I mean, these people aren't going to be affiliates for their whole life, right? No, Your Honor. So when does that stop? Again, I think you look to, as the Second Circuit says, the facts and circumstances of when they shed their affiliate status. Now, there is a definition of affiliate in Rule 144, right, in A1, that gives a specific definition of what an affiliate is. Yes. It says it's a person who controls or is controlled by or has undergone control of such issuer. Right. And I think maybe what we're getting at is the issue of whether the affiliates themselves have successfully shed the outward indicia of control. And that's when we will start their three-month clock. But then there's the separate issue of whether we're going to consider them to have been affiliates when their transfer of shares happens in a private transaction, when you have a third party like Ted Lee. So what's the answer to that? I mean, that's the question I'm asking. When does that occur in your view? In our view, I think their affiliate status, and I think the view of the Second Circuit, their affiliate status continues throughout the steps of the transaction that they set up to shed that affiliate status. Otherwise, you're creating a huge loophole for indirect distribution. You're allowing an affiliate of a corporation to orchestrate an indirect distribution to, while they still maintain their control status, sell to an intermediary who then would be free to immediately sell to the public and somehow shed their affiliate status as part of that same transaction to claim an exemption. After the transaction, it's pretty clear that the former shareholders didn't have any control, right? They don't have any control that week, but the question is whether they had control at the time they set up this indirect distribution. At the time, they are committed to transfer their shares. And so I think it would depend on whether the later transfer of shares to a third party was contemplated as part of the transaction in which they shed their affiliate status. Has the Commission contemplated changing Rule 144 to close this loophole? In fact, the Commission currently has proposed rules pending. Comments have been received. That would address this problem. It would address this problem in the context of shell companies, reverse mergers with shell companies, and it would make 144K unavailable in those circumstances. Well, I mean, there's nothing wrong with a reverse merger properly done. You'd agree with that? The Commission would agree that there are circumstances in which reverse mergers are perfectly legal and do not raise a problem. We don't think that's the context here. And I think getting back to the question of why you measure the holding period from the date of acquisition versus whether you deem the affiliates to have shed their status prior to a transfer, you have to, as with all exemptions to the registration requirement, look to the purposes of the statute. And here the purpose is to require registration in an indirect distribution. The holding period gets it that one way by trying to assure that the person who's taking the shares is not, in fact, an intermediary and they assume the economic risk of loss. Through that lens, it only makes sense to start the holding period when they, in fact, assume the economic risk of loss. Otherwise, you could simply contract for a long closing date, satisfy your holding period without ever assuming the economic risk of an investment, and it loses its value for the exemption. When I look at Rule 144, I have a preamble which explains the purpose of the rule was to eliminate some of the vagueness or confusion and the risks of liability by providing a safe harbor. But what you're saying about you can't just read the words of the regulation, you have to consider the purpose, seems to reintroduce this vagueness and risk back into the regulations. Well, I guess I have two responses to that. First of all, Rule 144 was drawn to address the vagueness and the question of whether someone takes with a view to distribution. And that is the issue it was attempting to clarify, and I think that's apparent from the preamble. This is a separate question, which is when is somebody an affiliate in the context of transferring their shares. And I don't think the language of Rule 144 answers that question for us. And that's why I think you're left going back to the terms of the statute and the purposes of the statutory exemption. And that's where you get into looking at whether this is, in effect, allowing someone to orchestrate an indirect distribution, yet avoid registration merely by the artificial construct of structuring this transaction in two steps. If you allow that, every transactional lawyer worth their salt in the country is going to start structuring their transactions like that, and you have a huge loophole to the registration requirement. Does it make any difference in your analysis that there's a cross-contingency clause? Yes, we do think it makes a difference. I mean, I think that you look to the facts and circumstances of the transaction. Right. If there's no cross-contingency clause, do you think the result is different in this case? In this case, no, because I think the evidence clearly shows that these transactions were negotiated together and contemplated together at the time of the agreement. Now, it's certainly helpful that these are. Helpful to you, but you don't think that's definitive one way or the other. Exactly. Exactly. The district court hinted that or suggested that 144K exceeded the authority of the SEC to promulgate that was inconsistent with the statute. Does the SEC agree with that? No, Your Honor. That's a surprise. I'm waiting with bated breath for my answer. We presume the answer. We would have been shocked if the answer had been otherwise. Well, I mean, I do think if you start to interpret Rule 144K in the manner in which the appellant urges, you start to reach a question of, well, is this a rule providing a safe harbor for something that Congress has, in fact, prohibited. And then I think you would have maybe at least a question as to authority. But we don't believe that's the case. We simply believe appellant is misinterpreting the rule. And properly interpreted, we don't think there's a problem here. I take it you aren't too fond of the district court's analysis. Is that true? Did you make that argument in front of the district court? No, Your Honor, we did not make that argument. The district court's analysis is sort of a product of his own creation. So do you agree with it or not? Well, I think there are some technical problems with, for example, his analysis of Rule 144. He assumes Rule 144K doesn't apply to restricted stock when, in fact, it explicitly applies to restricted stock. But at bottom, I don't think the commission disagrees with the way the district court analyzed the key question under the statute here, which is were these people affiliates at the time they transferred their share. And we've got no problem with looking at the statutory term purchase and interpreting that to include the contract to purchase. And, in fact, it's consistent with the way the staff has interpreted affiliate status in the past. I've made a couple of references to this, and I just want to make clear to the court what I'm saying since this is not something covered in the briefs that came up in the reply brief. In 1997, the staff of the commission issued a publicly available interpretation about affiliate status. And the question posed was if an affiliate contracts to transfer their shares within three months of shedding their affiliate status, they are not able to rely on Rule 144K, even if the transfer of those securities does not take place until after the rule's three-month waiting period is satisfied. So, in essence, we're saying you're still within the waiting period at the time you contract for these sales. You can't get around that by waiting to transfer them until after the rule's waiting period is satisfied. That's perfectly consistent with the district court's analysis here and the Second Circuit's analysis. And our position is it's at the moment they're bound to transfer those shares that you're looking to see whether they're an affiliate.  These sellers were still affiliates of the shell companies. Well, all this happened, I gather, subsequent to these transactions. What would have put a reasonable attorney on notice that the letter of the rule did not mean what it said? Well, in fact, the interpretation I just spoke of was in 1997, two years prior to these transactions. In addition, you know, there were enforcement actions that were brought. Specifically, the Kavanaugh case was brought prior to these transactions, and, in fact, the district court opinion in that case was issued in 1998 prior to these transactions. There was certainly... It was a slightly different context, though, right? Slightly different context because it was looking to the affiliates themselves selling their shares, but it's assessing the same question. This is the Second Circuit. See, the defendant had been affiliates within three months of their sale, I guess that was the result in that case. So different than here where... Well, that was part of the result in that case, and I think what you're referring to is the Second Circuit's later decision, which was, in fact, well after these transactions and, in fact, after the briefing on summary judgment. But the district court did find, yes, that those defendants transferred within the three-month waiting period and, therefore, could not avail themselves of the rule. The Second Circuit then also went on to say, and I quote, in addition, even if Rule 144 was not at issue here, the affiliates' status at the time they orchestrated, end of the quote, the affiliates' status at the time they orchestrated these transactions cannot simply be shed during the midst of the transactions in order to satisfy an exemption. And so the Second Circuit very specifically addressed the question that we are looking at in this case. And we simply disagree with Appellant's contention and his reply brief that that language is somehow contingent on the substantial burden present when a claimed exemption under Rule 144 has failed. We think that that transition in the Second Circuit's analysis is, in effect, making an alternative holding. And if you look at their analysis, they go to the purposes of Section 5 and the exemption in 401 to support that conclusion. They're not relying on any sort of extra substantial burden in that conclusion. Well, I gather at the end of the day this is really one, an issue of statutory interpretation purely and simply. Is that what you're saying? Because if I look at the letter of this, it doesn't quite say you look at the whole transaction. That may be a reasonable construction of the statute. But I don't find that in the letter of the rule itself. Are you just? No, I agree with that, Your Honor. I think, though, that there has always been, since I think the advent of the registration requirements, at least as far back as the Chinese Consolidated case in 1941, the principle that when you're construing exemptions to the registration requirements under the securities law, you have to construe them narrowly and you have to do so in light of the statutory purpose. And the premise of Section 5, the presumption is, all sales to the public are registered. We're going to only provide very narrow exemptions in circumstances where we don't think registration is required. And it's that backdrop that every question of an exemption from the securities law has to be looked at through. I want to touch briefly on the remedies issue. I think at bottom, first of all, I want to point out that the issue of whether there was a hiding of Medley's identity was actually not raised in the appellant's brief in this case. It was an issue below. It was an issue that the district court looked at. But it was not something that was challenged on appeal here. With that backdrop, we do think that hiding Medley's identity serves to give cover to the attorneys providing opinions in these cases. Now, it wasn't very effectively done, I don't think, in at least the digital bridge transaction where Robert Bryan is one of the shareholders, and Robert Bryan was actually a party to some of those agreements. And if you look at the stock transfer agreements, some stock goes to Bryan and some stock goes to 4D Management. So the attorney in that case didn't necessarily use the cover provided. But there is, I think, a purpose served by hiding his identity. And certainly, while the district court didn't decide this case and the participation theory, there is a theory that Medley could have been considered an underwriter based on his participation in these transactions. And by using nominees, it at least makes it harder to discover that the shares are being sold by someone who had a participation in putting together. But don't we have to reach that conclusion by inferential reasoning? And if that's so, on summary judgment, don't you lose that argument? Well, Your Honor, I have to draw all the inferences in favor of Mr. Medley. What are we left with on those questions? Well, again, I don't think it's key to the decision here, but to answer your question specifically with regard to the use of nominees, what the district court found was that Medley's declaration, merely setting out why these corporations and nominees exist, A, contradicted his deposition testimony as to why they were used and therefore wasn't sufficient to overcome summary judgment. And also, as we argued below, the fact that these corporations were set up as trusts for his children doesn't explain why they're used in these specific transactions. It doesn't create an issue of fact with respect to the point we're talking about. But beyond that, you know, with respect to remedies, I think we need to put in context why we're looking to scienter here. First of all, with respect to disgorgement, the district court assumed Medley's good faith and still found disgorgement appropriate. So any assertion of good faith or any sort of lack of reliance on the use of nominees can't affect the disgorgement order, and the district court was well within its discretion in ordering disgorgement, even if Medley acted in good faith. That's a remedy meant to prevent unjust enrichment, and the receipt of profits from illegal transactions is inequitable regardless of his good faith here. Scienter can be relevant to the issuance of an injunction. It's one factor in a five-factor totality of circumstances test. And what we're really looking at in the issuance of an injunction is whether there's a likelihood of future violations. And... But how did the district court rule on that issue? I thought that district court got that weighed in favor of Mr. Medley. With respect to Scienter, no, Your Honor. There are five factors in that test. District court assumed for summary judgment purposes that Medley understood the wrongful nature of his conduct and that he was sincere when he professed an intent not to violate in the future. The district court did find that Scienter and the other two factors, which are the recurrent nature of the violation and whether because of his business he's going to be placed in the position of perhaps violating again. The district court found all three of those factors weighed in favor of the issuance of an injunction. And we think that with respect to Scienter, that conclusion's justified on summary judgment because the only issue, the only evidence put forth with respect to good faith here are these two attorney letters in the M&A West and the digital branch transactions. The district court's analysis of those letters, as appellant conceded in his presentation, was that those letters could not reasonably be relied upon. In the face of that conclusion, it supports the conclusion that Medley's reliance was reckless, or at least in reckless disregard of the registration requirement here. And there's no question of fact requiring an assessment of credibility to make that recklessness finding here. Any further questions? Thank you for your argument. Thank you. Rebuttal? Okay. Thank you all for your arguments in the briefing. The case has heard will be submitted and will be in recess for the morning.
judges: Thomas, Tallman, Ikuta